AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
WESTERN DISTRICT OF NORTH CA[~]

FILED
CHARL[~]

[~] 2 2 [~]

U.S. [~]

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. 3:15-mj273-2 |
| WALTER EUGENE LITTERAL | ) |
| | ) |
| | ) |
| _____ | ) |
| Defendant(s) | |

## UNDER SEAL

### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___March 1, 2015 - to present___ in the county of ___Mecklenburg___ in the ___Western___ District of ___North Carolina___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, USC, Section 371 | Conspiracy to violate the following laws: |
| Title 18, USC, Section 922(a)(4) | Making it unlawful for any unlicensed person to transport any destructive device, i.e. "explosive...(i) bomb". |
| Title 18, USC, Section 922(a)(6) | Making it unlawful for any person to provide false information to acquire any firearm or ammunition. |
| Title 18, USC, Section 922(g)(1) | Making it unlawful for any person who is a felon to possess ammunition to ship or transport in interstate or foreign commerce. |
| Title 26, USC, Section 5861(d)(8) | Making it unlawful for any person to receive or possess a firearm or destructive device to include any explosive (A) bomb. |

This criminal complaint is based on these facts:

See Attached Affidavit of Task Force Officer Mark S. Kozen in Support of Criminal Complaint, incorporated by reference herein.

☑ Continued on the attached sheet.

_____
Complainant's Signature

Mark S. Kozen, Special Agent, TFO/FBI/JTTF
Printed name and title

Sworn to before me and signed in my presence.

Date: __7/22/15__

_____
Judge's Signature

City and state: ___Charlotte, North Carolina___    U.S. Magistrate Judge David C. Keesler
Printed name and title

## EXHIBIT C

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS AND APPLICATIONS FOR SEARCH WARRANTS

Affiant, Mark S. Kozen, a Special Agent (SA) with the Federal Air Marshal Service and a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI) Joint Terrorism Task Force (JTTF), being duly sworn, depose and states:

1. Affiant has been a federal law enforcement officer since June 1992. He is currently assigned to the JTTF in the Charlotte Division of the FBI. He has been assigned to the JTTF for approximately two and one half years. In his current capacity, he is assigned to investigations involving domestic terrorism related offenses. Prior to being assigned to the FBI JTTF, Charlotte Division, he was assigned to the Charlotte, N.C., and Philadelphia, PA., field offices of the Federal Air Marshal Service. Affiant has been the case agent, co-case agent, or participating agent on numerous domestic terrorism and aviation related investigations during his law enforcement career and has received training in such investigations during his prior law enforcement career and training at the FBI Joint Terrorism Task Force Operations Course at the FBI Academy in Quantico, Virginia. Affiant's training has continued through numerous in-service training seminars and courses during his career as a Special Agent / Federal Air Marshal. He has participated in various methods of investigation, including, but not limited to, undercover operations and the use of undercover agents, consensual monitoring, physical surveillances, interviews of witnesses and defendants, the use of search warrants, the use of seizure warrants, the use of confidential informants, the use of pen registers, and the use of intercepted wire communications.

2. The facts in this affidavit come from Affiant's personal observations, training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show

merely that there is sufficient probable cause for the requested warrants and does not set forth all of Affiant's knowledge about this matter.

## PURPOSES OF THIS AFFIDAVIT

3.    This Affidavit is submitted in support of the following requests:

    a.    A complaint and warrant for the arrest of Walter Eugene Litteral ("LITTERAL");

    b.    A complaint and warrant for the arrest of Christopher James Barker ("BARKER")

    c.    Applications requesting warrants to search the following:

        i)    A residence located at 3602 Pinecrest Drive, Gastonia, North Carolina, further described in Attachment A, wherein LITTERAL and his wife reside (hereinafter the "Litteral Residence");

        ii)    A black 2000 Ford Ranger with North Carolina license plate number 0027V and Vehicle Identification Number (VIN) 1FTZR15X6YTB00221 registered to LITTERAL (hereinafter the "Ford Ranger");

        iii)    A 2012 Kia Optima with North Carolina license plate number BJE2039 and Vehicle Identification Number (VIN) 5XXGM4A7XCG069030 registered to            (hereinafter the "Kia Optima");

        iv)    An AT&T mobile telephone used by LITTERAL with cellular telephone number (704) 747-6922, international mobile subscriber identity ("IMSI") number 310410708474371, subscribed to by          (hereinafter "Litteral's cell phone); and

        v)    A mobile telephone used by BARKER with cellular telephone number 704-675-0669, Serial Number 103257200572904, SIM

2

89014103257200572904 subscribed to by BARKER (hereinafter "Barker's cell phone").

## SUMMARY OF PROBABLE CAUSE

4.  Affiant declares that the facts detailed in this Affidavit provide probable cause to believe that beginning no later than March 1, 2015, and continuing until the present, LITTERAL, BARKER and other persons known and unknown, conspired to violate and did violate the laws of the United States by agreeing and planning to arm themselves with illegal explosive devices—i.e., pipe bombs—and arming BARKER, a convicted felon, with a semiautomatic assault rifle, large capacity magazine, ammunition, in violation of Title 18, United States Code, Section 371. The objects of this conspiracy include violations of the following federal statutes:

a.  Title 18, United States Code, Section 922(a)(4), making it unlawful for any person other than a licensed dealer to transport any destructive device, as defined in Title 18, United States Code, Section 921(a)(4)(A) to mean any "explosive ... (i) bomb" and (C) "any combination of parts either designed or intended for use in converting any device into a any destructive device [such as an explosive bomb] and from which a destructive device may be readily assembled."

b.  Title 18, United States Code, Section 922(a)(6), making it unlawful "for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, [to] knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented

3

identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition."

c.     Title 18, United States Code, Section 922(g), making it unlawful "for any person—(1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.;

d.     Title 26, United States Code, Sections 5861(d), making it unlawful for any person to receive or possess a firearm as defined in Title 26, United States Code, Section 5845(a) and (f), that is not registered to him in the National Firearms Registration and Transfer Record.   Title 26, United States Code, Section 5845(a)(8) defines a "firearm" to include a destructive device.   Section 5845(f) defines the term "destructive device" to include "(1) any explosive (A) bomb."

5.     For the reasons stated herein, there is probable cause to believe that searches of the Litterals' residence and any area within the curtilage of the residence, as well as Litterals' Ford Ranger and Kia Optima, and Litteral's and Barker's cellphones, will lead to evidence, fruits and instrumentalities of the aforementioned crimes as well as to the identification of individuals who are engaged in the commission of those and related crimes.

4

## FACTS ESTABLISHING PROBABLE CAUSE

6.  On or about June 18, 2015, FBI Special Agents and members of the JTTF—including your Affiant—received information from a confidential human source (hereinafter "CHS #1") concerning individuals with extreme and potentially violent anti-government views attempting to purchase, acquire and possess smokeless gun powder and other items to be utilized in the manufacturing of explosive or destructive devices. In addition, the same individuals had been purchasing military equipment such as .338 ammunition for use in a Lapua .338 caliber rifle, as well as such as handheld radios with throat microphones for communication, military issue Kevlar helmets and body armor vests with front and rear ceramic plates. According to CHS#1, these persons are preparing to use lethal force against United States government forces in order to defend against the imposition of martial law or other infringements on their rights. CHS #1 who operates a military surplus store in Gaston County, North Carolina, has provided reliable information to the FBI in the past. CHS #1 has not received any monetary compensation for his/her information.

7.  CHS #1 has stated that he/she began providing information to the FBI regarding this matter due to his/her concern for public safety. CHS #1 was introduced to LITTERAL after he/she moved his/her store to a new location in Gaston County in January 2015. LITTERAL was introduced to CHS #1 by a neighboring shop owner referred to herein as "CC" who has made violent anti-government statements in the past. LITTERAL and CC stated their belief that the federal government intended to use the armed forces to impose martial law in the United States, which they and others would resist with violent force. LITTERAL and CC began purchasing items from CHS#1's store to prepare for such an

5

attack in March and April 2015. By June 18, 2015, LITTERAL began stating specifics to CHS#1 on how he was going to manufacture destructive devices and CHS reported this information to the FBI who opened an investigation.

8.    LITTERAL told CHS #1 that he wanted to pack tennis balls with gun powder and Tannerite, and tape nails to the outside of the balls. Subsequent investigation has shown that when discussing gun powder, LITTERAL and CHS were in fact referring to smokeless rifle powder. Tannerite is the brand name for a binary explosive marketed over the Internet and various retail stores for making explosive targets for firearms practice. Tannerite is intended to be detonated when shot by a high-velocity firearm cartridge and has reportedly been used for detonating larger explosive devices when mixed with other materials. LITTERAL referred to these devices as "game changers." LITTERAL also planned to use coffee cans to create explosive devices by filling them with gun powder and ball bearings, placing them in a location and detonating them with a long range rifle shot. Another plan discussed by LITTERAL is to place M-80 fireworks inside pipe bombs in order to detonate them.

9.    Under federal law, explosive devices must be licensed and can only be legally manufactured and transported by licensed manufacturers and dealers. Affiant has consulted with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), the agency that regulates firearms and explosives in the United States. ATF has searched its records and found no listing that LITTERAL or his wife are licensed explosive dealers or manufacturers. Moreover, ATF has advised that while it is legal for an unlicensed person to possess and store smokeless gun powder for the purpose of reloading small arms

6

ammunition; once someone intends to use smokeless gun powder for something other than small arms ammunition—like a bomb or fireworks—the exemption does not apply. The small arms ammunition exemption is found in Title 18, United States Code, Section 845(a)(4). Smokeless powder is listed as an explosive material in the ATF "List of Explosive Materials." Typically, smokeless powder is considered a low explosive. Low explosives are required by ATF regulations to be stored at a minimum in a "Type 4 magazine." The construction requirements of a Type 4 magazine can be found in 27 CFR 555.210. Even if explosive materials are stored in a magazine, they still may not be stored in a residence or dwelling.

10. Even though LITTERAL is not a licensed manufacturer of explosive devices, he has demonstrated knowledge on how to make explosive devices, including the need to compact the gun powder in a container that will allow pressure to build, causing an explosion. In Affiant's experience, instructions on how to build homemade bombs are found on the Internet. LITTERAL and CC have discussed learning how to build smoke grenades on YouTube. LITTERAL has also told CHS#1 to email him at genelitteral@gmail.com.

11. LITTERAL also told CHS#1 that he was working with another individual in the Charlotte area that currently manufactures explosives for him. In later conversation, LITTERAL referred to "Chris" as a person who going with him (LITTERAL) to test homemade explosive devices. Through subsequent investigation and surveillance, Affiant learned that BARKER is one person helping LITTERAL make bombs.

7

12.    LITTERAL also purchased the following ammunition and military items from CHS#1:

    a.    Approximately 60 rounds of .338 ammunition from CHS #1 for use in a Lapua .338 caliber rifle. This weapon is designed for long range shots and is primarily used by the military and law enforcement as a sniper rifle.

    b.    Kevlar helmets and body armor vests with front and rear ceramic plates for himself and his wife, ]

    c.    A large black bag, which LITTERAL requested to be at least 48 inches long so he could fit his long rifles in it. He also stated that he intended to place weapons in the bag and place the bag somewhere that he could come back to at a later time.

13.    LITTERAL expressed to CHS #1 his interest in purchasing thermal sighting scopes for his rifles, fuses for his destructive devices, as well as handheld radios with throat microphones for communication.

14.    LITTERAL and CC discussed with CHS#1 their disapproval of the "Jade Helm" military exercises in the Southwestern United States and believe the exercise is a cover for the imposition of martial law in the United States. Jade Helm is a multi-state military training exercise taking place July 15 through September 15, 2015, involving members of U.S. Special Operations Command and service members from the military's four branches. While the exercise is taking place across seven states, the Special Operations Forces are only actively training in five states: Texas, Arizona, New Mexico, Utah and Colorado. The majority of the exercise will be conducted in Texas where according to open source records show LITTERAL's son resides. LITTERAL has requested that he receive the military items described above no later than July 15, 2015.

8

15.     In or about April 2015 through June 2015, LITTERAL used his cellphone to send and receive several text messages to/from CHS #1 discussing the purchase of, or his interest in the purchase of various survival and military equipment items, including, but not limited to, a surgical kit, magazine pouches for an AR-15 and pistol, gas masks, ammunition, hydration carrier, exploding targets and an 8 lb. bottle of black powder. (The content of these text messages referenced in this affidavit were extracted by an FBI forensic examiner from the CHS#1's cellphone upon receiving his consent to search the cellphone.)

16.     On April 22, 2015, via text message, CHS #1 asked LITTERAL "What weapon mag pouches will you need? Pistol and AR?". LITTERAL, utilizing his cellphone responded "3 pistol n 3 ar". CHS #1 sent LITTERAL another text message stating "Alright brother here we go....Tacpro carrier with ceramic plates front and back. Triple quick access AR mag pouch and triple pistol mag pouch on front. 3-tactical dump pouches on back for storage. Hydration carrier and bladder on rear. All of this molle'd together and ready to kick shit! $564.00 if cash". LITTERAL responded "That's me brother. When I come to pic my wife's plates up we'll get that rig. Thanks for all of ur help brother n look forward to seein ya soon". Affiant believes LITTERAL and CHS #1 were discussing the purchase of various military equipment ordered by LITTERAL.

17.     On May 1, 2015, LITTERAL, utilizing his cellphone had the following exchanges via text messages with CHS #1:

> **LITTERAL:** Army/Navy outlet, what the fuck? Where's the real
> men come in, u know, the MARINES!!!!!! LOL,
> it's Geno brother give me a call.

| | |
|---|---|
| **CHS #1:** | I knew that you guys were part of the navy so since you fall under their command I had you covered. I'll give you a shout shortly. |
| **CHS #1:** | By the way, your ammo should be here shortly, ill let us know when it rolls in |
| **LITTERAL:** | Good deal it's concerning the gas mask we want, may hay a great hookup. |
| **CHS #1:** | Sweet give me a few customers in the house. |
| **LITTERAL:** | Will do. |
| **CHS #1:** | Been busy brother, but your ammo is here. |
| **LITTERAL:** | Call me when u can. |

18.   On May 11, 2015, LITTERAL sent the following text message to CHS #1 utilizing his cellphone: "Hey brother I know ur off today but what do u know about some top of the line long distance 2 way radios maybe military grade?"

19.   On June 17, 2015, the following conversation occurred via text message over his cellphone::

| | |
|---|---|
| **CHS #1:** | How many exploding targets would you want?   The generally come in ½ and 1 lb containers. |
| **LITTERAL:** | 12-24 pending on price. |
| **CHS #1:** | Rodger that I'll look |
| **LITTERAL:** | 10-4 tanks brother |
| **CHS #1:** | Alright this is what I can do on the targets. 10 – 1lb targets 75.00. 20 – ½ lb targets 86.00.  Or individually ½ lb target – 8.00 ea.   I can get them in |

10

|            |                                                                      |
|------------|----------------------------------------------------------------------|
|            | other qty packs as well, but these kits seemed to be the best priced. |
| **CHS #1:** | And that damn big ass black duffle would be 28.00                   |
| **LITTERAL:** | Can ya go ahead n order 10 – 1 lb'rs n that big ass duffle bag n I'll get to ya tomorrow n pay ya for them.  Probably will order more as well.  Do ya have the black powder on hand? |
| **CHS #1:** | No, damn forgot about that standby.                                 |
| **CHS #1:** | 1lb or 8lb containers of powder?                                    |
| **CHS #1:** | Or 4 lb                                                             |
| **LITTERAL:** | 8lb                                                               |
| **CHS #1:** | 1lb bottle of powder – 24.00ea. 8lb bottle – 159.00ea              |
| **LITTERAL:** | 10-4.  I'll get u all the $ tomorrow and then we can get them ordered.  Can you at least go ahead n order the bag to get it on its way? |
| **CHS #1:** | Roger that                                                          |

20.     On or about June 19, 2015, a consensually recorded conversation occurred in person

between LITTERAL and CHS #1.  During this conversation, LITTERAL stated that he

intends to store the Tannerite unmixed "inside the house until we get ready to roll."  He

also said "I gotta get some tennis balls together.  I already got my pipe, my end pipes. I

guess what I'm gonna wind up doing firecracker initiators."  LITTERAL then said "on

both ends of my pipes I could slip a dag gone M80 up there."  He then continues and

indicates that he will pull the fuses out.  He continues, "then will come back and get my

11

Tannerite." Affiant believes that LITTERAL was describing to CHS #1 how he is going to manufacture destructive devices.

21. During the recorded conversation on June 19, 2015, LITTERAL also said that he plans to "rig" his house with explosives. LITTERAL stated to CHS "Lemme tell you something I gunna have my fucking house rigged up these mother fuckers come try to come in my house its going off we gonna look here we're partying." This conversation was recorded in person by CHS #1 on his/her cellular telephone and retrieved by an FBI forensic examiner. On July 15, 2105, in a court ordered recorded conversation between LITTERAL and a person identified as "J," LITTERAL stated that          his wife knows all this and then says "I got a fucking 45 beside my bed. I got a 45 and a 9 mil in my truck. I've got a 9 mil and a 380 or a 380 in her car. Safe full of weapons. You know what? Every time I open up this damn safe, I mean I've got, I've got at least 30 weapons that I can see and some tucked all the way in the back, back." Affiant believes that LITTERAL was describing his plan to use both legally and illegally obtained weapons against Government agents who attempt to enter his home for any reason.

22. On June 22, 2015, the following text messages were exchanged over Target Telephone #1:

> **CHS #1:** Hey bro, shoot me your email address and I'll send you a few links on this stuff I'm getting ready to look up for ya

> **LITTERAL:** genelitteral@gmail.com, thanks

> **CHS #1:** Roger that

> **LITTERAL:** Hey brother that was exactly what I was thinking. I'll be getting 2 radios and 4 throat Mikes with

12

earbuds.  Let me know how much I need to bring u
to get these in with s&h.

23.     On June 24, 2015, surveillance was conducted at CHS#1's store in Gaston County, North
Carolina.  LITTERAL's Ford Ranger was observed parked in front of the store.
LITTERAL was observed departing the store carrying a black bag and entering the driver's
side of Ford Ranger before departing the lot.  Previously, surveillance of the military
surplus store observed LITTERAL in the Kia Optima.  LITTERAL exited the vehicle on
the driver side, while a female was observed in the passenger seat.

24.     On June 26, 2015 surveillance was initiated upon LITTERAL in the vicinity of his
residence.  The Ford Ranger was observed unoccupied in the driveway.  On same date,
LITTERAL was observed several times driving the Kia Optima with a female in the
passenger seat.

25.     On June 27, 2015, when discussing obtaining a smoke grenade, LITTERAL advised CHS
#1 in person that he planned to hook it up to his front door.  This conversation was not
recorded.

26.     On June 30, 2015, CHS #1 advised that CC had entered his military surplus store and
purchased a Kevlar helmet, boots, and a military ruck sack.  CC also said that he was
going to bring his wife back at a later time for some items.  CC stated that "shit is gonna go
down soon".  Based on discussions with CHS #1, Affiant believes that CC was referring
to the belief that the government would soon declare martial law.  CC advised CHS #1
that he and LITTERAL have a base camp located on 99 acres of land in Clover, South
Carolina.  According to CC, he and LITTERAL intend to booby-trap the camp and draw

13

government's forces into the camp and kill them. CHS #1 also stated that approximately one month ago CC purchased one pound of gun powder from his store. This conversation was not recorded and is based upon reporting from CHS #1 to the FBI.

27. According to the CHS #1, most, if not all of the items ordered from his store by LITTERAL—including Tannerite and black powder—can be purchased online or in various specialty stores. LITTERAL has paid cash for all of the items ordered through CHS #1's store.

28. On July 1, 2015, a UCE was introduced to LITTERAL at CHS#1's store. LITTERAL discussed various areas of land that he utilizes to go shooting, including 99 acres in Clover, South Carolina. The specific location of these areas is not known at this time. This referenced meeting was consensually recorded using both audio and video techniques.

29. On July 3, 2015, LITTERAL contacted CHS #1 via text and asked CHS #1 to call him. When CHS #1 called Litteral's cellphone, LITTERAL advised him that he wanted to purchase four balaclavas from CHS #1. (A balaclava is a form of cloth headgear, like a ski mask, designed to expose only parts of the face.) Later that day, LITTERAL arrived at the military surplus store driving the Kia Optima.                    remained in the vehicle while LITTERAL was in the store. LITTERAL advised again that he wanted to purchase four balaclavas. He also told CHS #1 that CC will give him the location of their base camp. LITTERAL expressed concern that CC is "too high strung" and that he can't protect his family with someone like CC "in our group." This conversation was not recorded by CHS #1, but was reported to the FBI.

14

30.    On July 8, 2015, in a recorded conversation, CHS #1 contacted LITTERAL's cellphone and stated "I got uh your uh headsets in here and um your 8 pounds of stuff in here." LITTERAL responded "we gotta run let the dogs out and then we'll swing down by and pick it up." He then states, "we should be there within the next 30 minutes or so." LITTERAL also asks CHS #1: "any coordinates on them dag gone the regular radios?" Soon after this call was completed, LITTERAL was observed departing his residence and arriving at the military surplus store. The CHS #1 provided LITTERAL with the smokeless rifle powder he had ordered earlier and four (4) ear buds with throat microphones that he had previously ordered. (LITTERAL had ordered and paid for the smokeless rifle powder prior to any FBI involvement in this case.) This meeting was recorded utilizing both audio and video recording devices and was later reviewed and verified by Agents. Affiant reviewed the video and observed LITTERAL picking up the container of smokeless rifle powder. Upon doing so LITTERAL stated, "Mmmm the motherload." After approximately 20 minutes, LITTERAL was observed leaving the store carrying what appeared to be the container of smokeless rifle powder and placing it in the Kia Optima. A female passenger, believed to be                    , was in the passenger seat of the vehicle. Surveillance continued after LITTERAL departed the store and he was later observed returning to the Litterals' residence.

31.    On July 8, 2015, a consensually monitored conversation in the military surplus store recorded LITTERAL planning to manufacture destructive devices and test them in Shelby, North Carolina. Audio and video recording equipment was previously placed in the military surplus store with the consent of the CHS #1 to consensually monitor

15

conversations. During this conversation LITTERAL stated, "Dude I'm making pipe bombs.". LITTERAL also said that Chris—believed to be BARKER—will also be present for the testing. LITTERAL invited CHS #1 to go along to test the devices after they are assembled. LITTERAL stated that he has to compress the powder first, depending on the length of the tube. LITTERAL said he has the caps coming in, but has to figure out the depth of the cap. LITTERAL advised that "when you start compressing powder down you have to have a cardboard flute at the top so when you start screwing this top end down it crimps just like a shotgun round crimps down over that top and compresses all that stuff down in there with that M80 that goes as your igniter." He stated that "it"—referring to the explosion—"is gonna be awesome." He referenced the devices and said: "them mother fuckers are going to be like throwing two (2) grenades that's how much compression." He also stated, "This is dag gone 101 explosives. Once you compress it you got to you gotta get you gotta completely compress it you gotta you got to dag gone keep pressin."

32.     CHS has observed LITTERAL driving both the Ford Ranger and the Kia Optima to the military surplus store on several occasions. CHS #1 advised that LITTERAL carries a "bug out bag" in Ford Ranger that includes a 12 gauge pump shotgun, a .45 caliber pistol, and a 300 blackout rifle. (A bug-out bag is a portable kit that normally contains the items one would require to survive for seventy-two hours, when evacuating from a disaster; however some kits are designed to last longer periods of time than just 72 hours.) LITTERAL also used the Ford Ranger and Kia Optima to carry out the crimes described

16

herein to transport gun powder for the illegal purpose of making bombs and to obtain firearms for BARKER, a prohibited person.

33.    On July 14, 2015, LITTERAL was discussing fuses for pipe bombs in a consensually monitored telephone phone call between LITTERAL and CHS #1. LITTERAL stated "I was gonna start. I'm getting the end caps today so I was gonna start producing this weekend." He also advised, "I've got to pick a temperature where the gun powder does not get humidity in it because if it does then it's not no good. So I've got to pick a dry time in my garage to get some fans going keep it cool so it'll be this weekend probably in the later evening." Additionally, LITTERAL stated "It's pretty methodical on how you've got to put this shit together otherwise you got nothing but a fucking pipe and some god damn powder in it. You aint got shit." Affiant believes LITTERAL's reference to this weekend is referring to Saturday, July 18, and/or Sunday, July 19, 2015. In previous discussions, LITTERAL has mentioned that once he assembles the pipe bombs, he wants to test them on private property in Shelby, North Carolina with BARKER. LITTERAL told CHS #1 that "Chris" had been in the store with LITTERAL on a previous occasion and describes him as a "tall skinny guy" and that BARKER is a "real good friend of mine, his name's Chris. Old guy, he's 40, 45."

**LITTERAL's Purchase of an Assault Rifle for BARKER:**

34.    BARKER is prohibited from purchasing or possessing a firearm or firearm ammunition due to 1993 convictions for felony possession of stolen goods and felony possession of cocaine (which was pled down from possession with intent to distribute (PWID) and consolidated with the possession of stolen goods charge). A previous consensual

recording between LITTERAL and a CHS confirmed that LITTERAL knows that Barker is prohibited from purchasing a firearm.

35. On July 17, 2015, in a court authorized recorded phone conversation between LITTERAL and his wife , LITTERAL stated that he was on his way to Gander Mountain to purchase a gun for "Chris."

36. Human surveillance as well as electronic surveillance shows that on the afternoon of July 17, 2015, LITTERAL filled out an ATF form 4473 (Firearms Transaction Record) at Gander Mountain, 3704 East Franklin Blvd, Gastonia, North Carolina ("Gander Mountain") for the purchase of a Smith and Wesson MP-15, serial number SX23718, in which LITTERAL falsely stated that he (not BARKER) was the actual transferee/buyer of the gun.

37. In a court ordered recorded conversation between LITTERAL and his wife , while LITTERAL was in Gander Mountain, LITTERAL discussed a delay in the processing of the rifle purchase and that he will have to call BARKER to tell him that he cannot purchase his rifle for him that day.

38. On July 19, 2015, in a court ordered recorded phone conversation between LITTERAL and a male using Barker's cellphone, LITTERAL and the caller discuss BARKER's purchase of gun magazines and ammunition from Gander Mountain. Based on other investigation, Affiant believes that BARKER was the person calling LITTERAL.

39. Subsequent investigation has shown that on Sunday, July 19, 2015, at 7:09 PM, BARKER purchased ammunition (Remington American Eagle 223 full metal jacket bullets) and a ProMag AR-15 magazine (which can hold 30 rounds). This ammunition and magazine

18

can be used with the Smith and Wesson MP-15 that LITTERAL tried to buy for BARKER on July 17, 2015. Security cameras captured BARKER placing a box of Remington 223 full metal jacket bullets on the counter and then leaving the store with a bag. BARKER paid for the purchase with a debit card. The receipt bears the last four digits of the debit card and BARKER's date of birth.

40. After purchasing ammunition and the magazine, BARKER texted LITTERAL on his cellphone: "Hey. U Gunna B home in a bit? I was Gunna drop by some ammo I got if that's ok." Later BARKER texts LITTERAL: "Pulling up." Surveillance then observed a light colored Kia Sportage bearing North Carolina license plate YTL 5654 pull into the driveway at Litterals' residence. According to NC DMV this vehicle is registered to a JW and the registered address is 2230 West 6th Avenue, Gastonia, N.C., 28052. Previous database and NC DMV Operator's License address checks also identified BARKER as residing at 2230 West 6th Ave, Gastonia, N.C. 28052 and JW as a woman associated with BARKER. Affiant believes that BARKER brought the ammunition to Litterals' residence because BARKER and LITTERAL knew BARKER's possession of ammunition was illegal and they did not want to risk someone finding it in BARKER's residence.

41. In a court ordered recorded call between LITTERAL and CC on July 21, 2015, LITTERAL stated: "They put me on delay. Remember I told you I was going to buy a buddy..you know..a rifle because he had a felony against him." CC replied: "Uh huh." LITTERAL then said: "So I went down tried to buy it, they put me on delay. I got the rifle. They put me on delay. It's been four days now." Affiant believes that LITTERAL was referring to the assault rifle he attempted to purchase for BARKER at Gander Mountain on July 17, 2015.

19

The three business day NICS check delayed the purchase until at least Wednesday, July 22, 2015. (Unknown to LITTERAL, the FBI has instructed NICS to continue the delay until Monday, July 27, 2105.)

42. As noted above, BARKER is a convicted felon and is prohibited from possessing ammunition as well as firearms that has been shipped or transported in interstate or foreign commerce. The Smith and Wesson AR 15 ordered for BARKER by LITTERAL and the Remington ammunition purchased by BARKER were manufactured outside the state of North Carolina.

43. On July 19, 2015, monitoring agents also intercepted a call on the Litteral's cellphone in which LITTERAL and BARKER appear to be discussing the transfer of "hydro." Hydrocodone is a synthetic opioid, which is a Class II controlled substance in the United States. A prior search of trash left in front of Subject LITTERAL's house revealed empty prescription bottles of a number of drugs including OxyContin and Hydrocodone-Acetaminophen in LITTERAL's name and Hydrocodone-Acetaminophen in

's name, as well as syringes (containing an unknown substance).

It is illegal for LITTERAL who is not a medical provider to transfer a controlled substance to BARKER. It is illegal under Title 18, United States Code Section 922(g)(3) for a person who is an unlawful user of or addicted to any controlled substance from possessing firearms or ammunition that has been shipped or transported in interstate or foreign commerce.

20

**BARKER Provides Pipe Fittings to LITTERAL:**

44.     On the afternoon of July 20, 2015, LITTERAL received a SMS text message from Barker stating "hey there whiteboy I got ur pipe fittings if u want me to drop em off after work". LITTERAL replies "That'll be cool. Thank ya". Barker later texts LITTERAL: "B there n a sec" and LITTERAL replies "K". Shortly thereafter surveillance observed a light colored Kia Sportage bearing North Carolina license plate YTL 5654 pull into the driveway at the Litterals' residence. A male fitting BARKER's physical description exited the vehicle carrying an item and approached the front door of Litteral's residence. A short time later, the male departed in the same Kia and was surveilled to 2230 West 6th Ave, Gastonia, North Carolina—an address believed to be BARKER's residence.

45.     According to Affiant's consultation with FBI bomb technicians, three components are necessary to assemble a pipe bomb: an explosive, a container in which to compress the explosive and a fuse or ignition source. Previously, LITTERAL had told CHS#1 that he was building pipe bombs from cast iron pipes, but needed caps to fit the pipes. Investigation has shown that BARKER works for a company that installs pumps and would have access to pipe fittings. LITTERAL had also told CHS#1 that a person is assisting him in making bombs, which person—based on the facts and circumstances described herein—Affiant believes is BARKER. As noted above, LITTERAL has obtained gun powder from CHS#1 and was planning to purchase M-80 fireworks to place in the pipes with the gun powder to act a fuse. BARKER's message and presence at Litteral's residence with a package that could contain pipe fittings provides probable cause that BARKER is working with LITTERAL to make pipe bombs.

21

## PROBABLE CAUSE FOR SEARCH WARRANTS

46.    LITTERAL has stated to CHS#1 that he was acquiring components for pipe bombs. He has been observed driving from CHS#1 store to his residence after purchasing gun powder and military equipment. BARKER was observed at Litterals' residence after purchasing ammunition and texting LITTERAL that he was bringing it to the Litteral residence. BARKER was also observed bringing a package to the Litterals' residence after texting that he had pipe fitting that LITTERAL wanted. LITTERAL filled out ATF forms to purchase an AR15 for BARKER. LITTERAL also discussed providing drugs to BARKER which are apparently prescribed to LITTERAL and his wife, which drugs they keep at their residence. Based on Affiant's training, experience and this investigation, Affiant believes that LITTERAL told the CHS that he had placed items to injure government agents who attempted to enter his home and that he would use violence against those government agents." Based on the above, your Affiant asserts there is probable cause to search the Litterals' residence and seize the items described in Attachment B hereto.

47.    As described above, LITTERAL has used both the Ford Ranger and the Kia Optima when committing the offenses described herein. LITTERAL has stated that he keeps a "bug out" bag in his Ford Ranger that would corroborate the violent anti-government statements and plans he described to CHS#1. Based on the above, your Affiant asserts there is probable cause to search the Ford Ranger and Kia Optima for the items in Attachment B and seize the vehicle and any items listed in Attachment B.

22

48. As described above, LITTERAL uses his cellphone to communicate with CHS#1 and BARKER. BARKER used his cellphone to communicate with LITTERAL as described herein. Therefore, these mobile telephones were used as instruments in furtherance of their criminal activity. Based on the above, your Affiant asserts there is probable cause to search for Litteral's and Barker's cell phones to specifically conduct a search of their contents for the items in Attachment B.

49. As noted above, LITTERAL has described the manufacture of various types of improvised and homemade bombs. Recently, CC told CHS #1 that he and LITTERAL will be manufacturing smoke grenades and smoke bombs using cardboard paper towel roll centers and sugar. CC stated that LITTERAL and he will be designing these devices based on videos they have seen on You Tube. Videos, including You Tube, can be watched on a wide range of electronic devices including but not limited to; desk top computers, portable computers, tablets, iPads, video game consoles with on-line capabilities, and/or cellular phones. In addition, LITTERAL has told CHS#1 about his interest in Jade Helm and other government activities that he finds threatening. Affiant is aware that anti-government extremists use electronic devices to communicate. Moreover, LITTERAL has stated that he and CC own or have access to land they plan to use to mount anti-government offensives. Electronic devices are also used to map land use and for directions. Land ownership requires documentation and financing that are often maintained on electronic devices. Based on the above, your Affiant asserts there is probable cause to search electronic devices found in the Litteral's residence and Litteral's

23

and Barker's cellphones to specifically conduct a search of their contents for the items in Attachment B.

## REQUEST TO SEARCH, SEIZE AND EXAMINE COMPUTERS AND PERSONAL DATA DEVICES (INCLUDING "SMART PHONES")

50.     As noted above, the FBI's investigation has determined that mobile telephones and computers are being used as an instrumentality in the course of, and in furtherance of, the offenses described above.   Based on training, experience, and research, your Affiant knows that iPhones and other mobile devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.   Your Affiant's training and experience has shown that examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, where the device was used, travel information and even banking and finance information, especially while the owner is traveling.

**Technical Terms:**

51.     Based on your Affiant's training and experience and consultation with FBI computer forensic analysts, the following technical terms convey the following meanings that are incorporated into this Affidavit and Attachment B hereto:

    a.  **Wireless telephone**:   A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.   These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from

24

the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. **Digital camera**: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. **Portable media player**: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data.

25

Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. **GPS:** A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. **PDA:** A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media

26

include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. **iPad or Tablet**: An iPad is Apple's brand of a tablet. A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called applications or "apps," which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. **Computer hardware** is used to save copies of files and communications, while printers are used to make paper copies of same. Programs loaded on the drives are the means by which the computer can send, print and save those files and communications. Finally, password and security devices are often used to restrict access to or hide computer software, documentation or data. Each of these parts of the computer is thus integrated into the entire operation of a computer. In order to best evaluate the evidence, the computers—and all of the related computer

27

equipment described above—should be available to a computer investigator/analyst.

h. **IP Address**: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. **Internet**: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

**Electronic Storage and Forensic Analysis:**

52. Based on knowledge, training, and experience, your Affiant also knows that electronic devices including cell phones, tablets, computers and thumb drives can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on an electronic device. This information can sometimes be recovered with forensic tools.

28

a.  **Forensic evidence**.  As further described in Attachment B, the Applications for

Search Warrants seeks permission to locate not only electronically stored

information that might serve as direct evidence of the crimes described on the

warrant, but also forensic evidence that establishes how a device was used, the

purpose of its use, who used it, and when.   There is probable cause to believe that

this forensic electronic evidence might be on a device because:

b.  Data on the storage medium can provide evidence of a file that was once on the

storage medium but has since been deleted or edited, or of a deleted portion of a file

(such as a paragraph that has been deleted from a word processing file).

c.  Forensic evidence on a device can also indicate who has used or controlled the

device.   This "user attribution" evidence is analogous to the search for "indicia of

occupancy" while executing a search warrant at a residence.

d.  A person with appropriate familiarity with how an electronic device works may,

after examining this forensic evidence in its proper context, be able to draw

conclusions about how electronic devices were used, the purpose of their use, who

used them, and when.

e.  The process of identifying the exact electronically stored information on storage

medium that are necessary to draw an accurate conclusion is a dynamic process.

Electronic evidence is not always data that can be merely reviewed by a review

team and passed along to investigators.   Whether data stored on a computer is

evidence may depend on other information stored on the computer and the

application of knowledge about how a computer behaves.   Therefore, contextual

29

information necessary to understand other evidence also falls within the scope of the warrant.

f. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

g. **Nature of examination**. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants your Affiant is applying for would permit the examination of devices consistent with the warrants. Such an examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

53. **Seizure of Computer Records, including Passwords and Encryption Codes:** Your Affiant seeks to search for and seize any and all software, hardware, instructions, security codes, passwords and/or hardware which may be used to encrypt (secure) the computerized information. Such records include off site computer records accessible from the search location, magnetic mediums for storage and retrieval (like hard disks, diskettes, tapes, laser disks, Bernoulli drives, USB "thumb" drives, CDs, DVDs, external hard drives, cellular telephones, SIM cards) and all associated documentation describing the programs utilized for magnetic storage, as well as all computer equipment utilized to access, use and examine the computer stored records used for the aforementioned related documentation, including;

30

desktop computers, portable computers, monitors, keyboards, printers, external disk drives and tape backup devices.

54. **Manner of execution**. Regarding the computer search described above, it is the Affiant's intention to execute the requested warrants as follows:

   a. Constructively seize immovable computer equipment so that an expert can run the computer's program and generate a written format and/or electric or magnetic format duplicate, or secure the back-up copy all the records therein to determine if they are specified in the search warrant. The FBI requests authorization to remain on the premises until this is accomplished.

   b. Physically seize mobile telephones, iPads, tablets, PDAs and movable computer equipment (laptop computers, desk top computers, personal computers, monitors, keyboards, disk drives, printers and power supplies) disks, diskettes, tapes, modems, operating systems, manuals and software. This equipment and storage media will be analyzed and records and information as described in this warrant will be duplicated and/or printed in a written format.

   c. As with any search warrant, your Affiant expects that the warrants requested herein will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media must be seized or copied, and what computers or storage media need not be seized or copied. Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption. If, after inspecting the computers, it is determined

31

that some or all of this equipment is no longer necessary to retrieve and preserve the

evidence, the Government will return it.

## REQUEST FOR SEARCH WARRANTS

55.     Based on all of the facts and your Affiant's impressions and assertions detailed above, your

Affiant respectfully submits that there is probable cause to search the premises enumerated

above for the items above.   A separate list of items to be searched for, seized and

examined for each location is attached and incorporated herein as Attachment B, which is

incorporated herein by reference.

FURTHER AFFIANT SAYETH NOT

Sworn and subscribed this 22nd of July, 2015 in Charlotte, North Carolina,

Mark S. Kozen
Special Agent/Task Force Officer, FBI JTTF


Subscribed and sworn in my presence on this, the 22nd day of July, 2015.

David C. Keesler
United States Magistrate Judge

32